IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA　　　:　　　NO. 1:CR-04-301
　　　　　　　　　　　　　　　　　:
　　　　　　　v.　　　　　　　　 :　　　(JUDGE CONNER)
　　　　　　　　　　　　　　　　　:
ARTHUR GARCIA,　　　　　　　　 :
　　　　　　　　　　　　　　　　　:　(ELECTRONICALLY FILED)
　　　　　　　Defendant.　　　　 :

UNITED STATES' BRIEF IN OPPOSITION TO DEFENDANT'S
MOTIONS TO SUPPRESS EVIDENCE AND TO DISMISS

COMES NOW the United States of America, by and through its

attorneys, Thomas A. Marino, United States Attorney for the Middle

District of Pennsylvania, and James T. Clancy, Assistant United

States Attorney, and respectfully files this Brief in Opposition to

Defendant's motions to suppress evidence and to dismiss.

BACKGROUND

On September 8, 2004, a grand jury indicted the defendant on

the charges of use and attempt to use the internet to induce a

minor to engage in illegal sexual activity in violation of 18 U.S.C.

2422(b) and interstate travel to engage in illicit sexual conduct in

violation of 18 U.S.C. 2423(b).  The defendant filed pre-trial motions

to suppress evidence and to dismiss the interstate travel charge.

He argues that physical evidence should be suppressed for three reasons.  First, he claims that probable cause did not exist at the time of his arrest.  Second, he claims evidence obtained through search warrants should be suppressed because of a substantive defect – the defendant's age did not appear in the affidavits. Finally, he argues that evidence obtained through search warrants should be suppressed because of technical defects – the "date of violation" block on some of the warrant applications contains the date the warrant was sought rather than the date of the violation. He also argues that 18 U.S.C. § 2422(b), the travel charge, is an unconstitutional exercise of Congress' power to regulate commerce. A hearing was held on March 10, 2005. Because there was adequate probable cause to arrest the defendant and because, at the very least, the officer executing the warrants was acting in good faith reliance on the signed warrants, the defendant's suppression motions should be denied.  Further, because 18 U.S.C. §2422(b) is a valid exercise of Congress' power to regulate commerce, the motion to dismiss Count I of the Indictment should be denied.

FACTS

On January 31, 2004, at 2:26 a.m., fourteen-year-old Korena Stoner's parents called the Pennsylvania State Police ("PSP") to report their daughter missing.  Transcript of Hearing on Motion by Defense to Suppress Evidence ("Tr.") at 10-11.  Trooper Jere Hershberger was dispatched to the Stoner residence and arrived there at 3:03 a.m.  *Id.* at 11.  Mrs. Stoner related that she had been contacted by Korena's school on the previous day, Friday, January 30.  *Id.* at 11.  In that phone call, the school advised Mrs. Stoner that a male individual identifying himself as Korena's father had called the school to say she was sick.  *Id.*  The school wanted to know if Korena actually was sick because they also had received a similar call two days earlier.  *Id.* at 11-12.

The Stoner's advised the Trooper that following their daughter's disappearance, Korena's best friend, Samantha Wentz, told them that Korena had been talking with a man named "Joel" via instant messenger and e-mail on the Internet.  *Id.* at 12. Samantha reported that the man was from California and had flown

3

in from California to Pennsylvania approximately two weeks earlier. *Id.* "Joel" had sent money and gifts to Korena by FedEx. *Id.* at 12. When he arrived in Pennsylvania, "Joel" gave Korena a cellular phone with which they could stay in contact. *Id.* at 13. Wentz provided the number of that phone to the Trooper. *Id.*

The area around Korena's home computer was searched for information that might lead to her whereabouts. *Id.* Pieces of paper containing a name and a local hotel name and room number were found. *Id.* An inquiry made to Verizon revealed that the phone given to Korena was registered to Arthur Garcia of California. *Id.* at 15. Troopers contacted California to obtain motor vehicle records for Arthur Garcia; those records indicated that Arthur Garcia of Acorn Road was at least 55 years old. *Id.* at 15. The photograph of Garcia matched the description of "Joel" given by Wentz. *Id.* at 15-16. Additional information provided by Verizon revealed that the phone registered to Garcia, given to Korena by "Joel," had been used to call Korena's house, her school and another cell phone registered to Garcia. *Id.* at 17-18.

At approximately 2:00 p.m. on January 31, Korena was dropped off at Wentz's house. *Id.* at 19-20. Trooper Thomas Grothey went to Wentz's house and arrived there at 2:25 p.m. *Id.* at 44. He obtained permission to speak to Korena from her father. *Id.* at 46. He also was handed information about the car that dropped her off. *Id.* at 48.

By this time in the investigation, Trooper Grothey knew that Korena had been missing all night and that she had been with someone from California. *Id.* at 20. He wanted to get information from her as quickly as possible about what had happened before "Joel" left Pennsylvania. *Id.* When asked what happened, Korena hung her head for about thirty seconds. *Id.* at 21. Wentz and her mother were in the room at the time. *Id.* They left the room so Korena and Trooper Grothey could talk alone. *Id.* Korena then told the Trooper that she met "Joel" on the computer in October 2003, that he flew in from California to meet her, that he picked her up at her school bus stop on Friday, January 30, and that they stayed at a local hotel Friday and Saturday until she was dropped off at

Wentz's.  *Id.*  Korena said she and "Joel" had sexual intercourse.
*Id.* at 21-22.  Korena was fourteen and "Joel" was in his forties or
fifties.  *Id.* at 22.  She confirmed that the person in the California
motor vehicle photograph – whom the Trooper knew to be Arthur
Garcia – was "Joel."  *Id.* at 22.  The Trooper knew that Korena and
"Joel" were not married.  *Id.*

Upon hearing that information, Trooper Grothey contacted the
State Police Barracks in York.  *Id.* at 23.  He provided identifying
information and requested that Garcia be arrested for committing
statutory rape.  *Id.* at 23-24.  That request was received by the York
Barracks at 2:45 p.m. and Trooper Beron Steager was assigned at
2:50 p.m.  *Id.; see also* GX 4.  At 4:00 p.m., Trooper Steager
encountered Garcia at the Budget rental center at Harrisburg
International Airport returning his rental car and arrested him.  *Id.*
at 25.  A criminal complaint was filed at approximately 6:20 p.m.
before the on-duty District Justice charging Garcia with, among
other things, statutory rape.  *Id.* at 26.

After the arrest was made and charges were filed, Trooper Grothey sought and obtained a number of search warrants. *Id.* at 27. He first called the District Justice before whom he filed the charges, District Justice Garber. *Id.* District Justice Garber told Grothey to file the search warrants with District Justice Heilman. *Id.* at 28. Trooper Grothey contacted District Justice Heilman, explained the investigation to her and advised her that Garcia had been arrested on statutory rape charges. *Id.* at 28-29. Although the warrant applications presented to District Justice Heilman did not contain Garcia's age, by referring to Garcia as "the defendant" in a statutory rape case in those applications and affidavits, the Trooper believed that reference to include all of the elements of the crime of statutory rape. *Id.* at 28-30. Grothey conceded that on some of the warrant applications, he typed the date he was seeking the warrants rather than the actual violation date in the "date of violation" block. *Id.* at 82.

Once the investigation into Defendant's role in Korena's disappearance and sexual assault had begun, all of Defendant's

Internet accounts, including his America Online ("AOL") Instant

Messaging account, were frozen.  *Id.* at 81.

ISSUES

I.    WAS THERE SUFFICIENT PROBABLE CAUSE TO ARREST
      DEFENDANT WHEN POLICE HAD INFORMATION THAT HE
      WAS IN HIS FIFTIES AND HAD SEXUAL INTERCOURSE WITH
      A FOURTEEN-YEAR-OLD GIRL TO WHOM HE WAS NOT
      MARRIED?

II.   DOES DEFENDANT HAVE STANDING TO CHALLENGE THE
      WARRANTS FOR VERIZON PHONE RECORDS?

III.  SHOULD DEFENDANT'S SUPPRESSION MOTION BE DENIED
      BECAUSE THE OFFICER EXECUTING THE WARRANTS
      ACTED IN GOOD FAITH RELIANCE ON THE SIGNED
      WARRANTS?

IV.   IS 18 U.S.C. § 2422(b) A VALID EXERCISE OF CONGRESS'
      AUTHORITY UNDER THE COMMERCE CLAUSE OF THE
      UNITED STATES CONSTITUTION?

ARGUMENT

I.   THERE WAS SUFFICIENT PROBABLE CAUSE TO ARREST
     DEFENDANT WHEN POLICE HAD INFORMATION THAT HE
     WAS IN HIS FIFTIES AND HAD SEXUAL INTERCOURSE WITH
     A FOURTEEN-YEAR-OLD GIRL TO WHOM HE WAS NOT
     MARRIED.

"[P]robable cause to arrest exists when the facts and

circumstances within the arresting officer's knowledge are sufficient

in themselves to warrant a reasonable person to believe that an

offense has been or is being committed by the person to be

arrested."  *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir.

2003).  Probable cause is a "reasonable ground for belief of guilt."

*Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  A determination of

probable cause depends on the totality of the circumstances.  *Id.*

The belief of guilt must be particularized to the person that is going

to be arrested.  *Id.*  In determining probable cause, a court must

look at the events leading up to the arrest and then decide if those

facts, viewed from the standpoint of an objectively reasonable police

officer, constitute probable cause.  *Id.*  In this case, there was

sufficient probable cause to arrest the defendant for statutory rape.

9

"A person commits a felony of the second degree when that person engages in sexual intercourse with a complainant under the age of 16 years and that person is four or more years older than the complainant and the complainant and the person are not married to each other." 18 Pa.C.S.A. 3122.1.  Sexual intercourse, "[i]n addition to its ordinary meaning, includes intercourse per os or per anus, with some penetration however slight; emission is not required." 18 Pa.C.S.A. 3101.

When Trooper Grothey arrived at Wentz's house to interview Korena, he already knew that Korena was fourteen, Garcia was in his fifties and they were not married.  Korena told the Trooper that "Joel" had sexual intercourse with her.  Korena confirmed that she was fourteen years old and that the person in the photograph of Garcia obtained from California motor vehicle records was "Joel," whom she believed to be in his forties or fifties.  This information, the final bits of which were gathered within ten minutes of Trooper Grothey arriving at the Wentz residence, *compare* Tr. at 44 *with* GX

4, would be enough for a reasonable person to believe that the

Defendant had committed the crime of statutory sexual assault.

## II.   DEFENDANT DOES NOT HAVE STANDING TO CHALLENGE THE WARRANTS FOR VERIZON PHONE RECORDS.

Defendant's motion challenges the validity of twelve search

warrants.[1]  Of those twelve warrants, only six were to search the

person or possessions of Defendant; five warrants were for cellular

phone records and information from Verizon, a cellular telephone

service provider.

"Fourth Amendment rights are rights, which, like some other

constitutional rights, may not be vicariously asserted." *Rakas v.*

*Illinois*, 439 U.S. 128, 134 (1978), *quoting Alderman v. United States*,

394 U.S. 165, 174 (1969).  There is no infringement of a

defendant's Fourth Amendment rights if evidence seized from a

third party illegally is introduced against the defendant.  Only a

defendant's whose rights have been violated is entitled to the

---

[1]Defendant conceded his lack of standing to challenge the warrant to search Korena's computer and has withdrawn that challenge.  *See* Tr. at 63.

exclusionary rule's protections.  *Rakas,* 439 U.S. at 134; *see also, United States v. Baker*, 221 F.3d 438, 442 (3d Cir. 2000).

Defendant is not entitled to have the evidence obtained from Verizon suppressed.  The evidence was seized from a third party, and its introduction against the Defendant does not violate his constitutional rights.  *Rakas,* 439 U.S. at 134; *Baker*, 221 F.3d at 442.  Therefore, his motion should be denied as to those warrants.

III.   DEFENDANT'S SUPPRESSION MOTION SHOULD BE DENIED
       BECAUSE THE OFFICER EXECUTING THE WARRANTS
       ACTED IN GOOD FAITH RELIANCE ON THE SIGNED
       WARRANTS.

"[I]f a motion to suppress evidence obtained pursuant to a warrant does not present a Fourth Amendment argument that should be decided in order to provide instruction to law enforcement or to magistrate judges, it is appropriate for a reviewing court to turn 'immediately to a consideration of the officers' good faith.'"  *United States v. Ninety-Two Thousand Four Hundred Twenty Two Dollars and Fifty Seven Cents ($92,422.57),* 307 F.3d 137, 145 (3d Cir. 2002), *quoting United States v. Leon*, 468

U.S. 897, 925 (1984).  This case does not present a novel Fourth Amendment issue and, therefore, the court should proceed directly to an analysis of the good faith exception to the exclusionary rule.

"[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916; *see also, Illinois v. Gates*, 462 U.S. 213, 263-64 (1983) (White J., concurring); *$92,422.57*, 307 F.3d at 152.  A warrant normally is sufficient to establish that a police officer has acted in good faith.  *Gates,* 462 U.S. at 263 (White J., concurring); *United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001). Nevertheless, sometimes a warrant may later be invalidated because of a technical defect or a lack of probable cause. Excluding evidence under those circumstances would not deter police conduct, except to make the police less willing take the time to get a warrant.  *Gates,* 462 U.S. at 263 (White J., concurring). The exclusionary rule should not apply when an officer has conducted a search pursuant to a warrant and is acting in "objectively reasonable reliance" on that warrant.  *$92.422.57*, 307

13

F.3d at 145, *quoting United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993).

When determining the applicability of the good faith exception to the exclusionary rule, a court must ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *$92,422.57*, 307 F.3d at 146; *United States v. Loy,* 191 F.3d 360, 367 (3d Cir. 1999), *quoting Leon*, 468 U.S. 897, 922 n.3.  The Third Circuit has enumerated four situations when a police officer's reliance on a search warrant is not reasonable:

> (1) the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) the magistrate abandoned his judicial role and failed to perform his neutral and detached function;
>
> (3) the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or
>
> (4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Williams*, 3 F.3d at 74 n.4 (citations omitted); *see also, $92,422.57,*
307 F.3d at 146; *Hodge*, 246 F.3d at 308.

Defendant has not alleged that the warrants were issued in
reliance on deliberately or recklessly false information, that the
magistrate abandoned her neutral role, or that the warrant did not
particularize the places or persons to be seized.  Rather, Defendant
argues that the affidavits were deficient because they did not
contain the Defendant's date of birth and some of the applications
contained the incorrect date of offense.  The fact that Defendant's
age was not contained in the affidavit, and some of the warrants
had the wrong date of offense, do not make the warrants so deficit
that it would be unreasonable for the police officers to have relied
on the warrants, especially given that the magistrate had spoken to
the police officer and knew of Defendant's arrest.

It is the magistrate's job to determine the existence of
probable cause and to issue a warrant.  *Leon,* 468 U.S. at 920.
"Once the warrant issues, there is literally nothing more the
policeman can do in seeking to comply with the law." *Id, quoting,*

*Stone v. Powell*, 428 U.S. 465, 498 (1976) (Burger, C.J., concurring).

Penalizing an officer for a magistrate's error, rather than his own,

would not deter Fourth Amendment violations.  *Leon*, 468 U.S. at

920.

When determining reasonable reliance, "it may be appropriate

to include facts beyond the affidavit of probable cause, but only to

the extent that they relate to communications between the affiant

and the issuing magistrate." *United States v. Conley*, 813 F. Supp.

372, 385 n.3 (W.D. Pa. 1993), *rev'd on other grounds*, 4 F.3d 1200.

*See also, United States v. Edwards*, 798 F.2d 686, 691 (4th Cir.

1986) (officers' reliance reasonable when officers appeared before

magistrate and gave verbal information not included in the warrant

to the magistrate but that information not recorded).

While the affidavits presented to the District Justice did not

contain the Defendant's age or birth date, communications between

the police officer and the magistrate made Defendant's age known

to the District Justice.  It was not disputed at the suppression

hearing that the District Justice was aware of Defendant's arrest for

statutory rape.  *See* Tr. at 29.  Presumably, the District Justice

included this information in the determination that there was

sufficient probable cause for the warrants.  If the information

needed to be set forth in the affidavit, in addition to being

communicated verbally, the warrant should have been returned to

the police officer to be corrected.  Instead, the warrants were

signed.  The Trooper thought he was complying with the law, and

his good faith reliance on the warrants should be upheld and

Defendant's motion should be denied.

IV.   18 U.S.C. § 2422(b) IS A VALID EXERCISE OF CONGRESS'
      AUTHORITY UNDER THE COMMERCE CLAUSE OF THE
      UNITED STATES CONSTITUTION.

18 U.S.C. § 2422(b) ("§ 2422(b)") is constitutional because it is

a valid exercise of Congress' authority under the Commerce Clause.

*See* U.S. CONST., art. I, §§ 1, 3.  Defendant's only support for his

argument that it is not are cases prior to 1942 and a recent brief on

the Controlled Substances Act, *see Ashcroft v. Raich*, 2004 WL

1799022, that was submitted to the United States Supreme Court.

Def. Br. at 2-3.  A more thorough and contemporary look at the

17

Commerce Clause jurisprudence reveals that, in fact, § 2422(b) is
constitutional.

> A.   The Text of § 2422(b) and the Commerce Clause
> Demonstrate a Constitutional Exercise of Congress'
> Power Under the Commerce Clause.

The constitutionality of § 2422(b) based on the Commerce
Clause is a question of first impression in the Third Circuit.  Both
the text of § 2422(b) and the Constitution, however, demonstrate
that it is constitutional.  Section 2422(b) provides:

> Whoever, using the mail or any facility or means of
> interstate or foreign commerce, or within the special
> maritime and territorial jurisdiction of the United States
> knowingly persuades, induces, entices, or coerces any
> individual who has not attained the age of 18 years, to
> engage in prostitution or any sexual activity for which
> any person can be charged with a criminal offense, or
> attempts to do so, shall be fined under this title and
> imprisoned not less than 5 years and not more than 30
> years.

18 U.S.C. § 2422(b).  The statute criminalizes certain behavior by
individuals who use the mail or interstate commerce.  Congress has
the authority to enact this statute under the Commerce Clause,
which provides that, "[t]he Congress shall have Power [t]o regulate

Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. CONST., art. I, §§ 1, 3.  Congress' regulation of the activities for which individuals in different states use a means of interstate commerce, here the Internet to coerce a minor victim into having sex, is authorized by the Commerce Clause.  *Id.*

> B.   The Supreme Court's Decision in *Lopez* and the Jurisprudence that Has Followed Confirm that § 2422(b) is a Valid Exercise of Congress' Authority Under the Commerce Clause.

The Supreme Court's jurisprudence on the Commerce Clause and other Circuits' jurisprudence on this issue confirm that § 2422(b) is constitutional.  In fact, the Court has identified three categories of activity that Congress may regulate under the Commerce Clause:  1) "the use of the channels of interstate commerce," 2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce," and 3) "those activities that substantially affect interstate commerce."  *United States v. Lopez*, 514 U.S. 549, 558-59 (1995).  Congress' power to criminalize

those activities typically considered within the third category, intrastate activities that have an interstate effect, is limited under the Commerce Clause so to avoid "'obliterat[ing] the distinction between what is national and what is local and creat[ing] a completely centralized government.'" *Lopez*, 514 U.S. at 557 (quoting *Jones v. Laughlin Steel*, 301 U.S. 1, 37 (1937)). Defendant's primary argument seems to be that the effects of his conduct on interstate commerce are too insubstantial to fit within category three. *See* Def. Br. at 2-3. Defendant fails to recognize that federal regulation of any of *Lopez*'s three categories is authorized by the Commerce Clause.

Federal criminal regulation need only fit within one of *Lopez*'s three categories, not all three. In *Lopez*, the Court's introduction of the groups as "three broad *categories* of activity that Congress may regulate . . . ," rather than elements or factors, demonstrates that an activity's classification in any *one* of the groups indicates that Congress may regulate the activity. *Lopez*, 514 U.S. at 558-59 (emphasis added).

20

Later decisions affirm that classifying an activity within any one of the categories is sufficient.  For example, in *United States v. Robertson*, 514 U.S. 669 (1995), the Supreme Court reiterated that *Lopez*'s three categories are distinct.  The Court said, "the 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress' power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects." Thus, the Court declined to apply the "affecting commerce" test laid out in *Wickard v. Filburn*, 317 U.S. 111 (1942), because it concerns intrastate activities.  *See Robertson*, 514 U.S. at 671.  As the activity in *Robertson* was interstate, the Court concluded that the "affecting commerce" test was not necessary.  *Id.*  Thus, the Commerce Clause enables Congress to enact regulations concerning activities that fit within any one of the three categories.  Furthermore, in *United States v. Bredimus*, 352 F.3d 200, 206 (5th Cir. 2003), the Fifth Circuit followed the Supreme Court's example by rejecting the defendant's claim that statute was unconstitutional because the conduct it prohibited did not satisfy all three categories.  *Id.*

21

Section 2422(b) is a valid exercise of Congress' power to regulate and protect interstate commerce because its regulation involves at least the first two *Lopez* categories, channels and instrumentalities of commerce.  Whether the Internet constitutes a channel or instrumentality of commerce varies among the Circuits, but regardless of the category or categories into which the Internet is placed, the Internet is a manner of interstate commerce that can be regulated under the Commerce Clause.  Furthermore, although the third category, activities that substantially affect commerce, typically includes only intrastate activities and Defendant's activities were interstate, if that category were interpreted to include interstate state activities, Defendant's interstate activities substantially affect interstate commerce.

1.   Section 2422(b)'s regulation of "the mail or any facility or means of interstate or foreign commerce" is constitutional because the Internet is an instrumentality of commerce under *Lopez*.

The only authority within the Third Circuit on this issue is a single district court case.  However, its facts and decision are

22

sufficiently similar as to make it persuasive.  Like Defendant in the instant case, in *United States v. Tykarsky*, 2004 WL 1813206 (E.D.Pa. 2004), Tykarsky was charged with violating § 2422(b) and 18 U.S.C. § 2423(b).  After being convicted by a jury, Tykarsky filed a motion for acquittal and new trial.  Denying Tykarsky's motion, the court declared that "[t]elephone networks and the Internet are undoubtedly 'facilities of interstate commerce.'  Using a computer connected to the Internet equates to 'the use of a facility or means of interstate commerce . . . ."  *Id.* at *2 (citing Second and Eighth Circuit cases).  By saying "means of interstate commerce," the court implied that the Internet is an instrumentality of commerce without eliminating the possibility that it could be a channel of commerce as well.  The court reaffirmed its implication that the Internet is an instrumentality by quoting *Lopez*'s "instrumentalities of interstate commerce" language.  *Id.* at *2.  Given that telephones, even when used intrastate, are considered instrumentalities of interstate commerce, *see United States v. Richeson*, 338 F.3d 653, 660-61 (7th

Cir. 2003), *Tykarsky* correctly decided that the Internet is an instrumentality.

Circuits that have defined the Internet as an instrumentality of interstate commerce include the Eleventh and the Eighth.  In *United States v. Patten*, 397 F.3d 1100 (8th Cir. 2005), the defendant was found guilty of attempted violation of § 2422(b) after he crossed state lines to meet a police officer who had posed as a sixteen-year-old during sexually explicit conversations in an Internet chat-room.  Affirming the conviction on a number of grounds, the Eighth Circuit paraphrased § 2422(b), saying "[i]t is a federal crime to use an instrumentality of interstate commerce to knowingly persuade or attempt to persuade a person under the age of eighteen to engage in 'any sexual activity for which any person can be charged with a criminal offense.'"  *Patten*, 397 F.3d at 1101. Given that the court chose to paraphrase the statute, "to use an instrumentality," in that case involving Internet use, it is clear that the Eighth Circuit considers the Internet an instrumentality of commerce.

Similarly, in *United States v. Hornaday*, 392 F.3d 1306 (11th Cir. 2004), the defendant was charged with violating § 2422(b) after using the Internet to contact a police officer posing as a father who was willing to take his children to have sex with adults. The defendant was found guilty, and one of the defendant's appeals included an assertion that § 2422(b) exceeded Congress' power under the Commerce Clause. *Id.* at 1310. The court rejected that argument and affirmed the conviction, stating "[t]he [I]nternet is an instrumentality of interstate commerce." *Id.* at 1311.

The United States will present ample evidence in this case to show that Defendant used the Internet, an instrumentality of interstate commerce, to entice his minor victim to have illicit sexual intercourse with him. Defendant, in California, used an AOL instant messenger service and email accounts to contact and coerce his Pennsylvanian victim. Given that Defendant used this instrumentality of interstate commerce to persuade, induce, entice, and coerce his victim into having illicit sexual intercourse, § 2422(b) is constitutional under the Commerce Clause.

> 2.    Section 2422(b)'s regulation of "the mail or any facility or means of interstate or foreign commerce" is constitutional because the Internet is a channel of commerce under *Lopez*.

Furthermore, other courts have found the Internet to be a channel of commerce. For example, in *United States v. Borchert*, — F. Supp. 2d —, 2004 WL 407033 (N.D. Ill. 2004), the defendant's motion to dismiss the charges against him on the grounds that, *inter alia*, § 2422(b) exceeded Congress' authority under the Commerce Clause, was denied. *Id.* at *3. The court stated that "the statute prohibits the use of channels of interstate commerce persuasion, enticement, or coercion of a minor to engage in unlawful sexual activity. Such activity is clearly the type of immoral and harmful activity delineated in the first category in *Lopez* [the use of channels]." *Id.* at *4. By saying that the statute prohibits "the use of channels of interstate commerce," and then denying the defendant's motion to dismiss charges alleging that he had used the Internet, the court indicated that the Internet is a channel of commerce. Under the Commerce Clause, Congress has

"the right to regulate the use or misuse of the channels of commerce.  Congress may protect the channels of interstate commerce from immoral or injurious uses, and may forbid or punish the use of the channels to promote dishonesty or the spread of any evil or harm across state lines." *United States v. Schaffner*, 258 F.3d 675, 679-80 (7th Cir. 2001) (citations omitted).  *See also United States v. Smith*, — F.3d —, 2005 WL 628686, at *19, n.11 (11th Cir. 2005), *United States v. Maxwell*, 386 F.3d 1042, 1068 (11th Cir. 2004) (both cases are factually distinguishable because the statutes at issue involved pornography and the government could not prove an interstate commerce connection, but both suggest that the Internet is a channel of commerce).

The United States will present ample evidence in this case to show that Defendant used this channel of interstate commerce for the harmful purpose of coercing his minor victim into having sexual intercourse with him.  Defendant, in California, used an AOL instant messenger service and email accounts to contact and coerce his Pennsylvanian victim.  Given that Defendant used this channel

27

of interstate commerce to persuade, induce, entice, and coerce his victim into having illicit sexual intercourse, § 2422(b) is constitutional under the Commerce Clause.

> 3. Section 2422(b)'s regulation of "the mail or any facility or means of interstate or foreign commerce" is constitutional because his interstate use of the Internet substantially affects commerce under *Lopez*.

As noted above, *Lopez*'s third category – those activities that have a substantial affect on interstate commerce – typically is made up of those intrastate activities that do not fit within the first two categories. *See Robertson*, 514 U.S. at 671 (noting that because the activities were interstate, applying the "affecting commerce" test was unnecessary). However, if interstate activities were tested under the "substantial affect" test in *Wickard*, these interstate activities would be found to affect interstate commerce. *See Wickard*, 317 U.S. 111.

Defendant primarily relies on *Wickard*, 317 U.S. 111, when he appears to argue that § 2422(b) is unconstitutional as applied in this case because, allegedly, his actions had "no direct or indirect

impact on interstate commerce." Def. Br. at 2.  As noted above, however, "the 'affecting commerce' test [developed in *Wickard*] was developed in our jurisprudence to define the extent of Congress' power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects." *Robertson*, 514 U.S. at 671 (emphasis in original).  Furthermore, *Wickard* itself indicates that its holding is limited to intrastate activity questions:  "'the reach of that power extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power.'" *Wickard*, 317 U.S. at 124 (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942)).  Given that Defendant, in California, used the Internet to contact and coerce his victim in Pennsylvania, this is not a case of intrastate activity.  Therefore, Defendant's reliance on *Wickard* is misplaced.  *See Robertson*, 514 U.S. at 671.

However, if Defendant's interstate activities were evaluated to see whether they had a substantial effect on interstate commerce, they would be found to do so.  Defendant used AOL, headquartered

outside of California and Pennsylvania, to connect to the Internet and communicate with his victim.  Therefore, all Internet transmissions between Defendant and the victim traveled between at least two states.  The existence of those transmissions, therefore, had an impact on interstate commerce because they involved and, in fact, were a part of interstate commerce.

CONCLUSION

For all of the reasons set forth above, Defendant's pre-trial motions should be denied.

Respectfully submitted,

THOMAS A. MARINO
UNITED STATES ATTORNEY

By:   /s/ James T. Clancy
JAMES T. CLANCY
ASSISTANT U.S. ATTORNEY
P.O. Box 11754
HARRISBURG, PA  17108-1754
Phone:  717-221-4482
Fax:  717-221-2246
james.clancy@usdoj.gov
PA54339

Dated: April 4, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 1:CR-04-301 |
| | : | |
| v. | : | (JUDGE CONNER) |
| | : | |
| ARTHUR GARCIA, | : | |
| | : | (ELECTRONICALLY FILED) |
| Defendant. | : | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 4th day of April, 2005, she served a copy of the attached

UNITED STATES' BRIEF IN OPPOSITION TO DEFENDANT'S
<u>MOTIONS TO SUPPRESS EVIDENCE AND TO DISMISS</u>

via electronic filing and/or by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Harrisburg, Pennsylvania.

Gerald A. Lord, Esquire
139 East Philadelphia Street
York, PA 17403

/s/ Carol A. Manies
CAROL A. MANIES
Legal Assistant