**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 04-CR-301** |
| | : | |
| **v.** | : | **(JUDGE CONNER)** |
| | : | |
| **ARTHUR GARCIA** | : | |

**BRIEF IN SUPPORT OF PRE-TRIAL MOTIONS**

**I.**

**STATEMENT OF THE FACTS**

**<u>Introduction</u>**

Thomas Eugene Grothey, an 11½ year veteran of the Pennsylvania State Police, sent out an order to arrest Arthur Garcia on January 31, 2004, before Garcia departed from Pennsylvania.

The information that was available to Trooper Grothey, and the information related to responding police officers, prior to the defendant's arrest, is the subject of dispute in the above captioned case.

The Government contends that Grothey received information from Korena Stoner supporting the charge of statutory sexual assault, and then imparted that information to his colleagues, before Garcia was arrested on January 31, 2004.

The defense believes that Grothey came upon a tense and anxiety ridden situation when he reported for work on January 31, 2004, and hurriedly directed Garcia's arrest before he had gathered the requisite information to support probable cause to arrest Garcia.

The Government also contends that the search warrants that were issued in this case were valid and that all evidence obtained following the approval of the search warrant should be admissible at Garcia's trial.

Garcia disputes the Government's position that the search warrants were valid, maintaining instead that the absent of his age on all of the search warrant documents, with the inclusion of incorrect violation dates in some of the search warrants, the absence of receipt/inventory of seized property forms in some of the search warrants and the absence of witness signatures all lead logically, and almost indisputably, to the conclusion the issuing magistrates failed to carry out their functions with neutral and detached dispositions.

The Government also argues that the Commerce Clause permits Congress to prosecute Garcia for violation of Section 2422(b) of Title 18.  The defense maintains, to the contrary, Congress has overstepped its bounds, under the Commerce Clause, and, consequently, the prosecution of Garcia for violation of 18 U.S.C. §2422(b) is impermissible.


**Probable Cause To Arrest**

Trooper Grothey testified that he arrived at work at 11:00 a.m., January 31, 2004, and learned that the mother of Korena Stoner had contacted the Pennsylvania State Police at 2:26 a.m. on January 31, 2004, indicating her daughter either ran away or had been abducted.  (Tr. pps. 10-11).

Grothey was told that Samantha Wentz, a friend of Korena Stoner, disclosed to the Stoners that Korena Stoner had established contact with a male named "Joel" on the internet. (Tr. p. 12).  The individual named Joel had purportedly flown in from California about two

weeks before January 31, 2004, and it was believed by Samantha Wentz that Joel may be currently with Korena Stoner.  (Tr. p. 12).

Grothey stated that a Trooper Wise had received information that a cellular phone had been given to Korena Stoner by "Joel" and that number was provided to Trooper Wise, who then contacted the Verizon phone company legal department and learned that the telephone had been activated by an individual named Arthur Garcia from California. (Tr. pps. 14-15).[1]

Trooper Wise contacted the motor vehicle department in California and requested they forward a photograph of Garcia to the Pennsylvania State Police.  (Tr. p. 15).  Among other things the photograph and identifying information – date of birth and address – were provided to the Pennsylvania State Police.  (Tr. p. 15).

According to Grothey Samantha Wentz provided a physical description of Joel as follows:  "dark haired, dark gray hair, who was an older male, 40, 50's, with a moustache."  (Tr. pps. 15-16).[2]

Grothey stated that Korena Stoner also told him that, among other things, Joel was "either in his 40s or 50s."  (Tr. p. 22).[3]

---

[1] Trooper Grothey stated that he did not believe he or any other law enforcement officer has attempted to place a call to the cellular number listed to the cellular phone that was allegedly given to Korena Stoner by Arthur Garcia, even though her family and the state police were attempting to locate her between 2:26 a.m. and 2:00 p.m. the 31st day of January, 2004.  (Tr. p. 39).

[2] Jere Hershberger's account of Samantha Wentz's description includes an estimation of age of "approximately 40 yoa."  (Government Exhibit 2, p. 2).  There is also no language in Grothey's report supporting his claim that Samantha Wentz used the term "50s" when estimating Joel's age.  (See Government Exhibit 3).

[3] Grothey's police report indicates that Korena Stoner gave the following description:  "W/N/M dark hair with gray in it, hair like below the ears, Approx. 508 in height . . .."  (Government Exhibit 3, p. 7).

Before 2:00 p.m. on January 31, 2004, Trooper Grothey had received information that Korena Stoner, a 14 year old minor, may have been abducted, or may have willingly left the area of Pennsylvania, with "Joel".  (Tr. pps. 15-16).

Trooper Grothey, also before 2:00 p.m., went out to Verizon, Galleria Mall, and received a history of the cellular telephone calls that were being made on the cellular telephone that was purportedly given to Korena Stoner by "Joel".  (Tr. pps. 17-18).

Grothey testified that he left Verizon and, while traveling in the direction of Korena Stoner's house, he received a telephone call from the York Barracks of the Pennsylvania State Police informing him that Philip Stoner had reported that Korena Stoner returned to the home of Samantha Wentz at 2:00 p.m. on January 31, 2004.  (Tr. pps. 17, 19-20).  Grothey testified he arrived at Samantha Wentz's house, was met by Mrs. Wentz at the door of the residence, saw Korena Stoner in the living room of Mrs. Wentz's house, and then the following occurred:

> At that time through the investigation, knowing that she was missing all night long, knowing that she was with the subject by the name of Joel and that he was out of the area, that we had him being from California, at that time I told her that I needed to find out what happened right away, because basically I wanted to locate the subject before he left the area due to the fact that he was out of state.  (Tr. p. 20).

Grothey agreed that, up to 2:00, he had received no information, from any source whatsoever, that Korena Stoner was assaulted, sexually or otherwise, or taken away against her will.  (Tr. p. 41).

Grothey testified that he asked Korena Stoner what happened in the preceding hours, to which Stoner replied, after an approximate 30 second delay, during which she dropped her head down, that "Joel" had picked her up from the school bus stop on Friday, January 30, 2004, took

her to the Best Western Hotel in York, and that he and Stoner had engaged in sexual intercourse twice while at the hotel.  (Tr. p. 21).  Stoner also indicated she was only 14 years old, while also indicating that the male she was with was "either in his 40s or his 50s".[4]  (Tr. p. 22).

Grothey also handed the photograph he received from the motor vehicle department in California to Korena Stoner and Korena Stoner affirmed that the "Joel" she was with was the Arthur Garcia shown on the photograph.  (Tr. p. 22).

Grothey testified he received the information about Korena Stoner's sexual experience with "Joel" within the first ten minutes of talking to her on January 31, 2004.  (Tr. p. 23).

Grothey claimed that he was then handed a piece of paper by Mr. and Mrs. Wentz which contained information about the registration plate of the automobile Korena Stoner occupied before she was dropped off at their house.  (Tr. p. 23).  Grothey testified that he found out that the vehicle was 2004 Toyota Corolla, white, and owned by Budget Rental near the Harrisburg Airport.  (Tr. p. 23).

Grothey testified that he imparted the information about the registration plate to the Pennsylvania State Police Barracks in York after he had received information about Korena and "Joel" having sex at the hotel.  (Tr. pps. 21-23).  He also claims that the information about the sexual activity was passed on to the York Barracks and then disclosed to the Harrisburg State Police along with a request from Trooper Grothey to have the defendant arrested.  (Tr. pps. 23-24).

Grothey agreed that the time the events in question were occurring he was taking down notes about his observations. (Tr. p. 43).   He also agreed that the typed police report was

---

[4] See footnote 3.

probably prepared "several days after the incident," and was based, at least partly, on notes that he was making at the time the events were occurring.  (Tr. p. 43).  Grothey also agreed "the information . . . placed in (the) . . . police report was based on (his) . . . truthful recollection of the events based on partially (his) . . . notes."  (Tr. p. 43).  Finally, Trooper Grothey agreed that the police report he prepared was "substantially accurate (and) . . . it reflects what happened."  (Tr. p. 44).

Although Grothey testified on direct examination that he contacted the York Barracks of the Pennsylvania State Police, who then contacted the Harrisburg Barracks, he testified on cross examination that Arthur Moss is the person he contacted and that he had asked Arthur Moss to have the airport police at Harrisburg International Airport intercept Garcia.  (Tr. p. 41, 51).

Later, Grothey testified that he "advised (Trooper Steager) . . . that (he) . . . wanted Arthur Garcia taken into custody because he had committed statutory rape.""  (Tr. p. 83).  He then clarified that he had actually given the information to "Corporal Moss and Trooper Wise."  (Tr. p. 83).[5]

The Government submitted two computer generated memos relevant to the initial disappearance of Korena Stoner and the request to have Garcia arrested.  (Government Exhibits 1 and 4).  Grothey testified that the first computer generated memo, Government Exhibit 1, contained information about a code 2904, which related to a missing person/runaway.  (Tr. p. 56).  The initiating time was 2:26 a.m., the time that the case was reported to the Pennsylvania State Police by the Stoners.  (Tr. p. 56).  The other computer generated memo, Government

---

[5] Grothey agreed that the person he contacted was Moss; no mention was made of Trooper Wise and there is nothing in Grothey's report to indicate that he had any conversation with Trooper Wise about a statutory rape being committed by the defendant.  (See Government Exhibits 1-3).

Exhibit 4, was initiated at 2:45 p.m. on January 31, 2004.  (Tr. p. 58).  On that document the following language appears:  "code 3307 . . . request assistance PSP station . . .."  (Tr. p. 61, See Government Exhibit 4).  It also indicates the following:  "Check airport FO possible runaway incident with PSP York. . . .."  (Tr. p. 61).  There was no language on the second automated incident memo, created after the reported sexual assault, that indicated or referenced sexual assault or any other sexual offense.  (Tr. p. 61).

As mentioned above Grothey testified that Trooper Steager had been advised that a statutory rape had occurred.  (Tr. p. 24).  Nonetheless, Steager's police report actually indicates a "rape incident". (Government Exhibit 3, p. 23), but there is no language in the report to indicate how Steager received this information or from where he received it.  (Government Exhibit 3, p. 23).  Furthermore, the defendant was actually charged with rape, consistent with Steager's report, but that information was generated following a subsequent interview with Stoner – after January 31, 2004.  (Government Exhibit 3, p. 22).

Grothey testified that Trooper Steager intercepted Garcia near the Harrisburg Airport, at the Budget Rental Car Agency, on January 31, 2004, at which time he took Garcia into custody. (Tr. p. 25).

In the backdrop of Trooper Grothey's sworn testimony of March 10, 2005, he also agreed, as mentioned above, that the police report that he prepared, recounting the events of January 31, 2004, is based on his own recollection and, significantly, notes that he compiled while the events were occurring.  (Tr. pp. 42, 43-44).

Grothey stated that he arrived at the Wentz residence on January 31, 2004, at 2:25 p.m. (Tr. p. 44).  Grothey stated he had to get out of his unmarked vehicle and go from the driveway

to the door of the residence.  (Tr. p. 45).  Mrs. Wentz then had to permit him entry into the home.

(Tr. pps. 45-46).

After Grothey entered the Wentz home he then placed a phone call to Philip Stoner, Korena Stoner's father, so that he could request permission to interview Korena Stoner.  (Tr. p. 46).  Grothey agreed that the telephone call to Philip Stoner occurred before the interview of Korena Stoner.  (Tr. pps. 47-48).

Grothey further agreed that he accepted a piece of paper with the number of the registration plate of the vehicle occupied by Garcia and Korena Stoner before the interview of Korena Stoner took place.  (Tr. p. 48).

Grothey agreed that his police report indicates that all the following information was set forth before he contacted Corporal Arthur Moss to have the defendant intercepted:

- Registration number of Garcia's vehicle
- The year of the vehicle
- The make of the vehicle
- The owner of the vehicle
- That Garcia was going to fly back to California
- That Garcia would be flying out of the airport in Harrisburg

(Tr. pps. 48-51).

Grothey also agreed that the report contained no information indicating that he immediately received information from Korena, and passed that information on to his colleagues, and then sat down and received a more detailed description from her.  (Tr. p. 51).

Grothey agreed that his police report indicated that after receiving the above information about the vehicle, the fact that the defendant was flying back to California out of Harrisburg, and the owner of the vehicle, he "then contacted Corporal Arthur Moss via phone."  (Tr. p. 49).

Grothey admitted he read Arthur Moss's report of the events in question.  (Tr. p. 52). Moss's report indicated that Grothey "contacted him by cellular phone and related that the victim was dropped off at her friend's house by the accused."  (Tr. p. 53).  He also indicated that Grothey told him "that the accused had checked out of the Best Western Hotel on Kenneth Road prior to dropping off the victim."  (Tr. p. 53).  Moss's report also stated that he was told by Grothey "that the accused was going back to Harrisburg airport operating a white Toyota rental car."  (Tr. p. 53).  Moss's report also indicates that he arrived at the Best Western Hotel at 1435 hours (2:35 p.m.) on the date in question (Tr. pps. 53-54).

Grothey confirmed that Moss's report was "accurate".  (Tr. p. 53).

Grothey agreed that there was no information provided in Arthur Moss's police report that included information about Garcia sexually assaulting Stoner.  (Tr. p. 55).

**Search Warrants**

The defense introduced Exhibits 1 through 1b and Exhibits 1d through 1j at the pre-trial hearing on March 10, 2005.  All of these exhibits were copies of the search warrants and accompanying documents that Trooper Grothey executed before two different district justices on February 2, February 10, February 11, and February 17, 2004, respectively.

None of the search warrants, the affidavits, or any of the accompanying documents contain any information about the defendant's age.  (Tr. pps. 66, 69, 70, 72, 73, 74, 75, 76, 77, 78, 79).

The first two search warrants were signed by District Justice Vera Heilman, Magisterial District No. 19-3-04, on February 2, 2004, at 1:00 p.m.  (Exhibits 1 and 1A).  Neither of the

receipt/inventory of seized property forms accompanying these documents were signed by a witness.  (Tr. pps. 66, 68, 69).  Nor were these search warrants personally served on Arthur Garcia.  (Tr. pps. 68-69).

The next three search warrants were signed by District Justice Heilman on February 10, 2004, at 10:50 a.m.  (Exhibits 1B and 1D).  No receipt/inventory of seized property forms accompanied the search warrant applications.  (Tr. pps. 70-72).

The next three search warrants were signed and approved by District Justice Heilman on February 11, 2004, at 10:05 a.m.  (Exhibits 1E-1G).

Each of the search warrants list the date of the criminal violation as February 11, 2004. (Tr. pps. 73, 74, 75 and 76).  No receipt/inventory of seized property forms are attached to the search warrants.  (Tr. pps. 73, 74, 75 and 76).

The remaining search warrants were signed by District Justice Daniel Garber, Magisterial District 19-2-03, on February 17, 2004, at 11:05 a.m.  (Exhibit 1H-1J).

Each of the warrants that were presented to District Justice Garber listed the date of criminal violation as February 17, 2004.  (Tr. pps. 76, 78, 79). These search warrant applications also were not presented with accompany receipt/inventory of seized property forms.  (Tr. pps. 77, 78, 79).

Neither District Justice Heilman nor District Justice Garber were the district justices before whom Trooper Grothey brought the original complaint and affidavit of probable cause in Garcia's case.  (Tr. p. 77).

Trooper Grothey contacted FBI Agent Scott Sutherland at 8:30 a.m. on February 2, 2004, approximately 5 hours before the first search warrants were approved.  (Tr. pps. 79-80).  During

the telephone conversation that Grothey had with Sutherland he passed on details of the investigation – including the instant message and e-mail addresses of Korena Stoner and Arthur Garcia.   (Tr. pps. 80-81).   Agent Sutherland advised Trooper Grothey that the federal government would be interested in pursuing an investigation of Garcia and, furthermore, Sutherland confirmed that he would have all of Garcia's AOL computer accounts frozen.   (Tr. pps. 80-81).   Following the telephone conversation Grothey faxed details of the case to Sutherland.  (Tr. p. 81).

## II.

### ISSUE

**DID THE POLICE HAVE PROBABLE CAUSE TO ARREST ARTHUR GARCIA ON JANUARY 31, 2004?**

### ARGUMENT

The Government would maintain that the sworn testimony of State Trooper Thomas Grothey satisfies the Fourth Amendment requirement of probable cause to arrest.  Specifically, Grothey testified that he was told by Korena Stoner that Arthur Garcia, a male in his 40s or 50s, had sexual intercourse with her, at a time she was 14 years of age, at a hotel in the hours before she was interviewed by Trooper Grothey.

The defense does not dispute the presence of probable cause in this case, if Trooper Grothey's testimony is accurate.   It is believed by the defense, however, that Grothey's recollection of the transpiration of the events is inconsistent with his police report, Steager's

police report, Moss's police report, the automated incident memos, and several portions of his own sworn testimony.

**[A]      Time Line**

The record establishes that Grothey arrived at the Wentz residence at 2:25 p.m. on January 31, 2004. The record also establishes that Corporal Arthur Moss arrived at the Best Western Hotel on Kenneth Road, York, at 2:45 p.m. on January 31, 2004. The telephone call to Moss, directing him to arrest Garcia, had to be made less than 10 minutes after Grothey arrived at the Wentz residence.

The window of time during which Grothey would have collected the information about the alleged sexual assault diminishes as the various details of the case are considered.

As mentioned above, Grothey arrived at the Wentz residence at 2:25 p.m., but he then had to get out of his vehicle, walk to the Wentz residence, and then be admitted into the house. He then had to meet with Korena Stoner to discuss her whereabouts with her. The record, however, indicates that Grothey did not immediately request information from Korena Stoner about the events of January 30 and January 31, 2004. Instead, Grothey placed a phone call to Philip Stoner to request permission to interview Korena Stoner.

As the record indicates Grothey did not know the make, the model or the year of the vehicle driven by Garcia because that information had not been relayed to him; instead, he was given the registration number on a piece of paper handed to him by the Wentzes. Before he could order Moss to send out a directive to stop Garcia in that vehicle he had to receive the information about those details by conducting an inquiry about the registration number, which

would have required him to radio or telephone the appropriate agency or agencies to receive the information.  Again, this had to be done before the phone call to Moss because the information relayed to Moss had not yet been discovered by Grothey until after he arrived at the Wentz residence.  In short, then, Grothey must have requested information himself about the vehicle occupied by Garcia and Stoner, which would have required another radio or telephone inquiry, so that he could pass that information onto Corporal Moss.  It seems to be the only logical series of events because Grothey's report and Moss's report both set forth that Grothey told Moss about the year (2004), make (Toyota), and owner (Budget Rental) during their apparently one and only telephone call directing Moss to have the defendant arrested.

We also know that Moss was not at the Best Western Motel, prior to the phone call from Grothey, because that information had not been learned yet from Korena Stoner.  Accordingly, Moss was at another location and then had to drive to the Best Western Motel to arrive there at 2:45 p.m.

To summarize Grothey's arrival at 2:25 p.m. was necessarily followed by travel from his car into the home, meeting Mrs. Wentz and Korena Stoner, the telephone call to Philip Stoner, the telephone or radio transmissions to obtain information on the vehicle, and the conveyance of all that information to Corporal Moss.  Because Corporal Moss did not know anything about the Best Western Motel, and because he arrived at the Best Western Motel at about 2:45 p.m., he must have received the information from Grothey prior to 2:45 p.m.

**[B]**   **Grothey's Report**

Grothey testified, under oath, that he made notes of the events in question contemporaneous to the time that the events were occurring. He testified that those notes were accurate and that they were consulted when he prepared his police report.

Grothey's police report is significant for several reasons. First, as an 11½ year veteran of the Pennsylvania State Police, Grothey would have been undoubtedly aware of the necessity of developing probable cause before having an individual arrested. Because he was dealing with a tense situation, in which a possible felon might be leaving the state, the harried nature of the first gathering of information would have been noteworthy in his report. Nonetheless, Grothey's police report, admitted by him to be accurate and also prepared several days after the incident with notes made at the time of the incident, indisputably establishes that Grothey requested that Moss arrest the defendant before Grothey actually learned the details of the incident – including the alleged sexual assault. The flow of the information of the police report is consistent with the tenor of the events: a missing teenager dropped off at the home of her friend by an out-of-state suspect who was heading toward the airport to return to California.

It is respectfully submitted that in his zeal to apprehend the defendant the dutiful trooper found out where the defendant was going and what he was driving and immediately directed that he be arrested. Then the trooper sat down with the alleged victim and received the information about the alleged sexual offenses.

The relevant portions of Grothey's police report are set forth below:

INTERVIEW:  Korena Stoner

On 1/31/04 at **1425 hrs.** I traveled to the address of Samantha WENTZ, 1440 Round Top Rd. Lewisberry Pa. 17339.   I interviewed Korena STONER at the residence.  **I first contacted** her father Philip and requested permission to interview STONER.   Philip granted me permission to interview her.

**Before the interview** I was advised that they obtained the registration plate number of the vehicle before GARCIA left.

Registration number TA/DGL1109, **2004 Toyota Corolla** white in color. Owner:   **Aero Corp. 1998 WHBG Pike Middletown, PA 17057**. STONER advised GARCIA is planning on flying back to CA. today.  He will be flying out of Harrisburg Airport.  **I then contacted Cpl Arthur Moss via phone**.  I requested him to contact **Harrisburg Airport Police** to intercept GARCIA before he flys back to Ca. Harrisburg Airport Police advised that they will travel to Budget Rental Agency to intercept GARCIA.

I asked STONER where she was the last two days.  STONER related she was with a male subject.  His name is Joel.  She doesn't know his last name. They were at the Best Western Hotel near the West Manchester Mall.  I asked her to start from the beginning on what happened.   Government Exhibit 3, pps. 3-4.  (emphasis added).

There is simply no language in the police report, prepared closer to the time of the events in question, supporting Grothey's recollection that he hurriedly received information within 10 minutes about what Garcia had allegedly done.  Also of interest is the fact that Grothey stated in his report:  "I asked her to start from the beginning on what happened."  (Government Exhibit 3, p. 5).   Grothey then provides a several page narrative of his interview of Korena Stoner. (Government Exhibit 3, pps. 5-7).

It is believed by the defense that had Grothey received information from Korena Stoner that Garcia engaged in intercourse with her at the Best Western Hotel, all this information being

passed on in the first few minutes of him meeting her, he would have placed that information in his police report after review of his notes and his recollection of the events.

**[C]**     **Moss's Report.**

Grothey reported in a supplemental, and then testified on March 10, 2005, that he called Corporal Arthur Moss to begin the process of arresting the defendant.  Corporal Arthur Moss prepared a police report recounting his recollection of the events.  (Government Exhibit 3, p. 24). Moss recounted the telephone with Grothey as follows:

> On 01/31/04, Tpr. GROTHEY contacted me via Nextel (cellular phone) and related the VICTIM was dropped off at her friend's house on Round Top Road by the ACCUSED.  Tpr. GROTHEY also advised the ACCUSED had checked out of the **Best Western Hotel** on Kenneth Road, prior to dropping off the VICTIM.  Tpr. GROTHEY related the ACCUSED is en route back to the Harrisburg Airport and he is operating a white **Toyota Rental** car.
>
> At about **1435 hours**, I arrived at the BEST WESTERN Hotel located at 1415 Kenneth Road, West Manchester Twp., York Co., Tel #717-767-6931 . . .. Government Exhibit 3, p. 24.

Moss's report is significant for several reasons.  First, Moss learned that Garcia had checked out of the Best Western Hotel.  He then had to drive to that location.  He arrived at about 1435 hours.  Because he arrived at 1435 hours, he had to be contacted by Grothey before 1435 hours.

Moss's report is also significant because his narrative of the events is consistent with Grothey's narrative.  First, neither Moss nor Grothey report that Grothey learned that a sexual assault occurred before he made the phone call to have Moss begin the arrest process.  Second, Moss's report confirms what Grothey's report stated:  that the victim had been with the accused

16

and the accused could be found "en route to the Harrisburg Airport and he is operating a white Toyota rental car."  (Tr. p. 53).  (Government Exhibit 3, p. 24).

Two veteran state troopers prepared reports recounting the events that led to the defendant's arrest, but neither report indicates that Grothey received information about a statutory sexual assault before he made the phone call to Moss.


**[D]      Pennsylvania State Police Automated Incident Memo System – Query**

After Grothey called Moss the Harrisburg State Police Barracks was contacted at 2:50 a.m.  The queries printed out by computer by the Pennsylvania State Police provide insight into the communications that were exchanged by the officers and departments.  As established at the pre-trial hearing, the Pennsylvania State Police assigns codes and provides descriptions with regard to the nature of the matters being investigated.  For example, when the incident of Korena Stoner's absence was originally reported on January 1, 2004, at 2:26 a.m., the case was assigned to Jere Hershberger at 4:17 a.m.  (Government Exhibit 1).  The printout setting forth the skeletal description of the case notes, among other things, the following:  Code 2904 missing person – runaway.  This description and code number comport with the nature of the investigation that was being conducted by the Pennsylvania State Police when the case was originally reported by Mrs. Stoner.  (Government Exhibit 1).

Approximately 5 minutes after Corporal Moss arrived at the Best Western Hotel, State Police in Harrisburg were contacted and a new query memo was formed.  (Government Exhibit 4).  The code number assigned was 3307 – REQ. ASSIST-PSP STATION.  Furthermore, the

remarks attached to the changed inquiry are set forth on the bottom of the exhibit: "check airport FO (sic) possible runaway incident with PSP York."  (Government Exhibit 4).

The language contained on Government Exhibit 4 further confirms that no information about a sexual assault was immediately related to Moss during Grothey's phone call.   It confirms, instead, what the police reports stated, that this was a runaway/missing person incident, that the missing person was found, that she was a minor, and that the person was with her was heading back to California.

**[E]     Beron Steager Report**

The Government would argue that Beron Steager's report contains an entry about the suspect being involved in a rape incident in York County.   (Government Exhibit 3, p. 23). Steager's report is consistent with the reports of Moss and Grothey in that information about the vehicle had to be ascertained by Grothey first because that information was passed on to Moss, who then passed the information on to Pennsylvania State Police York who, in turn, passed it to Steager.

The reference to "a suspect in a Rape incident in York Co.", more than anything else, establishes that Steager learned about the rape charges after Korena Stoner's second interview, which occurred after January 31, 2004.  In fact, Trooper Grothey's report indicates that Garcia was not originally charged with four counts of rape on January 31, 2004, because the issue of force had not been learned until a follow-up interview, Government Exhibit 3, p. 22, the report indicating that the follow-up interviews occurred on February 1, 2004, (Government Exhibit 3, p. 10), and February 9, 2004.  Government Exhibit 3, p. 16).

The logical conclusion to reach regarding Steager's report of the rape incident is that he learned of the alleged rapes after one or both of the follow-up interviews, but before he completed his supplemental report.  Otherwise, a veteran police officer, knowing the difference between statutory rape and rape, would have included statutory sexual assault or statutory rape in the report or would have specifically indicated that that information was relayed to him before he engaged in arrest procedures with Garcia.

**[F]   Trooper Wise Report**

Grothey testified at one point that Trooper Wise was advised that Garcia had sexual intercourse with Stoner.  Interestingly, there is no report from Trooper Wise attached to Grothey's incident report.  (See Government Exhibit 3).  Also significant is the absence of any language in the incident report and its supplementals that indicate that any information about statutory rape or statutory sexual assault was passed on to Trooper Wise prior to Garcia's arrest.

**ISSUE**

**WHETHER SECTION 2422(b) IS UNCONSTITUTIONAL UNDER THE COMMERCE CLAUSE?**

**ARGUMENT**

Way back in 1819 the United States Supreme Court stated succinctly:  "Congress is authorized to pass all laws 'necessary and proper' to carry into execution the powers conferred on it."  M'Cullough v. State of Maryland, 4 Wheat. 316, 324 (1819).

The <u>M'Cullough</u> court went on to state as follows:

> A power without the means to use it is a nullity.  But we are not driven to seek for this power in implication:  Because the Constitution, after enumerating certain specific powers, expressly gives to Congress the power 'to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof.' . . ..  We contend, that it was necessary and proper to carry into execution several of the enumerated powers, such as the powers . . . of regulating commerce with foreign nations, and among the several states . . ..

> <u>M'Cullough</u>, 4 Wheat. at 353-354.

Significantly, the United States Supreme Court also went on to state that the Congress cannot promulgate laws that "change the subordinate into fundamental powers (and) . . . make the implied powers greater than those which are expressly granted . . .." <u>M'Cullough</u>, 4 Wheat. at 365.  Finally, the United States Supreme Court also noted as follows:

> It is well known that many of the powers which are expressly granted to the national government in the constitution were most reluctantly conceded by the people, who are lulled into confidence, by the assurances of its advocates, that it contain no latent ambiguity, but was to be limited to the literal terms of the grant: and in order to quiet all alarm, the 10th article of amendments was added, declaring 'that the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.' . . .. The creation of a sovereign legislature implies an authority to pass laws to execute its given powers.  This clause is nothing more than a declaration of the authority of congress to make laws, to execute the powers expressly granted to it, and the other departments of the government.  But the laws which they are authorized to make are to be such as are necessary and proper for this purpose.  No terms could be found in the language, more absolutely excluding a general and unlimited discretion than these.  It is not 'necessary or proper,' but 'necessary and proper.'  The meanings used must have both these qualities.  It must be, not merely convenient – sic – adapted – proper, to the accomplishment of the _____ and view; it must likewise be necessary for the accomplishment of that end.

> <u>M'Cullough</u>, 4 Wheat. at 366-367.

In 1824 the United States Supreme Court stated the following:

> The power given to Congress to regulate commerce with foreign nations, and between the several States, relates to commerce, in the proper acceptation of the term; 'the exchange of one thing for another; the interchange of commodities; trade or traffic.'  This is the direct subject of the power; and by force of the auxiliary power, 'to make all laws which shall be necessary for carrying into execution the foregoing powers,' Congress has passed laws . . . (to) afford the means of regulating commerce . . .."

> Gibbons v. Ogden, 22 U.S. 1, 89-90.

It appears to be without question that the government's concern in this case is that the defendant allegedly used an instrumentality commonly possessed by persons in various states, and used to transact business in various states, thereby making it interstate facility, but the defendant committed criminal activity through this interstate facility.  Among other cases, the government cited to U.S. v. Tykarsky, 2004 WL 1813206 (E.D. Pa.) and U.S. v. Maxwell, 386 F.3d 1042 (11th Cir. 2004).  In Tykarsky, the United States Supreme Court stated the following: "Telephone networks and the internet are undoubtedly 'facilities of interstate commerce.'" Tykarsky.  The issue in Tykarsky, however, dealt with whether the government should have to prove that communications between the parties went beyond state lines.  Tykarsky.

In this case, in contrast, the defendant is not arguing that the communications went beyond state lines.  The defendant is arguing, instead, that the communications between the parties, though occurring across state lines, had absolutely no impact on commerce and, therefore, did not generate a necessary and proper role for Congress to involve itself in regulation.  More particularly, the parties exchanged feelings for one another, over the internet, with a small minority of those communications involving sexual banter.  The government's

concern is obviously connected to the danger of minors being persuaded to enter into relationships with manipulators and pedophiles, all begun and continued through the internet, with the end result being that the older adult taking advantage of the susceptible and naive minor and using the internet to do the same.

The government also points to the <u>Maxwell</u> case for support of its argument that the commerce clause permits prosecution of the defendant under the pertinent statute. See <u>U.S. v. Maxwell</u>, 386 F.3d 1042 (11th Cir. 2004). It appears that <u>Maxwell</u> was another case that involved intrastate activity. See <u>Maxwell</u>. Nonetheless, some of the language in <u>Maxwell</u> is particularly applicable in this case:

> We have no intention of breaking new ground here. As the Supreme Court has warned, applying an aggregation approach to noneconomic, criminal activity when assessing its impact on interstate commerce would effect an interpretation of the Commerce Clause that essentially vests general police powers with the federal government.
>
> <u>U.S. v. Maxwell</u>, 386 F.3d 1042, 1060.

The 11th Circuit went on to state as follows:

> We need not – and do not – hold today that there is absolutely no set of facts on which the intrastate possession of child pornography could not have a substantial impact on interstate commerce. Nevertheless, we fail to comprehend, for instance, how the possession of an illegal magazine might substantially affect interstate commerce because it contains a foreign staple. Because we have no doubt that there are some instances in which a defendant can possess child pornography created with materials that traveled from out of state without substantially affecting interstate commerce, we conclude that Section 2250A's jurisdictional hook is patently insufficiently to ensure the statute's constitutional application . . ..
>
> <u>Maxwell</u>, 386 F.3d at 1063.

The government also referred the court to <u>U.S. v. Borchert</u>, 2004 WL 407033 (M.D. Ill.), but the <u>Borchert</u> case clearly supports the defendant's position:

> Whereas the <u>Witkard</u>[6] the statute regulated an interstate market indirectly through regulation of purely local production, the same cannot be said of Section 2251(a) or Section 2250A(a)(5)(B). These statutes "make no effort to control national trade by regulating intrastate activity. Instead, [they] attempt to regulate primary conduct directly, even within state borders." (citation omitted). Even if, in the aggregate, offenders like Smith somehow impact an interstate market by producing child pornography for their own use, "Congress is clearly not concerned with the supply of child pornography for the purpose of avoiding surpluses and shortages or for the purpose of stimulating its trade at increased prices." Id. The conclusion is thus inevitable that the statutes under which Smith was convicted are not concerns "with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." (citations omitted). "As the regulated activity . . . is not commercial, *Witkard's* aggregation analysis is not applicable." <u>Raisch v. Ashcroft</u>, 352 F.3d 1222, 1230 (9th Cir. 2003), *cert. granted*, -- U.S. – 124 S.Ct. 2909, 159 L.Ed.2d 811 (2004); *see also* <u>Morrison</u>, 529 U.S. at 611 n.4, 120 S.Ct. at 1750 n.4 ("In every case where we have sustained federal regulation under the aggregation principle in [*Witkard*], the regulated activities was of an apparent commercial character" (.) *Witkard* is thus readily distinguishable, as the statute it sustained was far more obviously a regulation of commerce. We are not inclined to expand the limits of the federal commerce power beyond what the Supreme Court has suggested to be at our limits.

> <u>U.S. v. Smith</u>, 2005 WL 628686, p. 13 of 23, (11th Cir. Fla.).

The instant case is bereft of any evidence of commercial activity. The government seems to enforce regulation of noncommercial, alleged criminal activity. In essence, the government is prosecuting interstate communications, fantasy or not, involving the use of the internet, with absolutely no economic value and no discernible impact on interstate commerce. The government would point to <u>U.S. v. Schaffner</u> as support for the proposition that the "Congress had, under the Commerce Power, the right to regulate the use or misuse of the channels of

---

[6] See <u>Witkard v. Filburn</u>, 317 U.S. 411 (1942).

commerce."  U.S. v. Schaffner, 258 F.3d 675, 679 (7th Cir. 2001).  In Schaffner the 7th Circuit court stated as follows:  "Congress may protect the channels of interstate commerce from immoral or injurious uses . . .."  Schaffner, 258 F.3d at 679.

Unlike the cases cited in Schaffner this case involves thoughts and words, rather than "goods, kidnapped persons, prostitutes and guns" traversing state lines.  Schaffner, 258 F.3d at 680.  Furthermore, unlike the cases cited in Schaffner, the communications were for solely noncommercial purposes.

The government cannot get past the fact that the instant case is distinguishable from most of the cases it cites.  Noncommercial communication, albeit immoral, with no ability to affect commerce, cannot fall within the ambit of government regulation.


## ISSUE

**DID THE SEARCH WARRANTS FAIL TO SATISFY THE REQUIREMENTS OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION?**


## ARGUMENT

The framers of the United States Constitution wrote that "No Warrant shall issue, but upon probable cause, supported by Oath or affirmation, particularly describing the place to be searched, and the person or things to be seized."  U.S. Const. Amend. IV.  Because a search warrant must be supported by probable cause "[t]he validity of the warrant must be assessed on the basis of the information that the (police) officers disclose, or had a duty to discover and disclose, to the issuing magistrate."  Maryland v. Garrison, 480 U.S. 79, 85 (1987).

The probable cause information contained in a search warrant affidavit must lead an issuing magistrate to a conclusion that there is a "fair probability that contraband or evidence of the crime will be found . . .." Illinois v. Gates, 462 U.S. 213, 238 (1983).

Following the defendant's arrest in this case, Trooper Grothey prepared numerous search warrant applications and accompanying documents; 10 of those search warrant applications were introduced at the suppression hearing on March 10, 2005.  (See Exhibits 1 to 1j).  Each of the search warrant applications and accompanying documents contain no information about the age of the defendant.  The alleged crime, statutory sexual assault, requires that a defendant be four or more years older than the complainant.  See 18 Pa. C.S. §3122.1.[7]  None of the search warrant applications and affidavits contain factual allegations, either directly or inferentially, that could lead a reasonable, neutral and detached magistrate to believe that there is a fair probability that the defendant was four or more years older than the complainant.  Without probable cause to believe that each element of the sexual offense has been made out the issuing magistrates were presented with insufficient information to support approval of the warrants.

The Government has argued that additional information was passed on orally to one or both issuing magistrates.  The rules of criminal procedure, however, which derive from the Fourth Amendment of the United States Constitution, clearly provide that information outside of the sworn written affidavit will be presented under oath.  Federal Rule of Criminal Procedure 41(d)(2).  The requirement that testimony outside of the written affidavit be sworn meets the

---

[7] The corresponding federal crimes also require that the defendant be four or more years older than the complainant.

demands of the Fourth Amendment of the United States Constitution.  Tabasko v. Barton, 472 F.2d 871 (6th Cir. 1972), *cert. den*. 412 U.S. 908; *see also* 24 ALR Fed. 107.

Limiting the analysis to the four corners of the search warrant application and supporting affidavits all search warrants and evidence are facially deficient because, among other reasons, the important element related to the age difference is absent.  Spinelli v. United States, 393 U.S. 410 (1969).

The Fourth Amendment demands that a search warrant application be reviewed by a "neutral and detached magistrate", Johnson v. United States, 333 U.S. 10, 14 (1948), who is not a "rubber stamp" for the prosecution.  Aguilar v. Texas, 378 U.S. 108, 111 (1964).

In this case, although the magistrates signed off on all the warrants prepared by Trooper Grothey, it was originally Grothey's errors in failing to include language about the age difference and, therefore, the prosecuting trooper should be charged with knowledge that the warrant was defective.  Groh v. Ramirez, 540 U.S. 551 (2004).  Nevertheless, two different magistrates, on four separate occasions (February 2, February 10, February 11 and February 17) were presented with 10 search warrant applications, yet failed to notice that an important element of statutory sexual assault had not been discussed or referenced in the documents.

Compounding the errors were the additional defects that were also apparently missed by the sitting magistrates.  Six of the search warrants (Defense Exhibits 1e-1j) contain the wrong dates of violations.  Nine of the search warrants (Defense Exhibits 1b-1j) had no inventories of the property seized attached to them.  See Federal Rule of Criminal Procedure 41(f)(2).  Of the two search warrants that contained inventory of seized property forms (Defense Exhibit 1 and 1a), neither was witnessed by another officer or other credible person and, therefore, it was

presumed that another officer was not present when the items belonging to the defendant were being handled by the trooper outside of the defendant's presence.  See Federal Rule of Criminal Procedure 41(f)(2).  Additionally, neither of these warrants (Defense Exhibits 1 and 1a) were served on, or given to, the defendant.  See Federal Rule of Criminal Procedure 41(f)(3)(A).  The Federal Rules of Criminal Procedure allow searches and seizures, by way of warrant, when a law enforcement officer presents, *inter alia*, "evidence of a crime" or evidence of "contraband, fruits of the crime, or other items illegally possessed . . .."  Federal Rule of Criminal Procedure 41(c)(1),(2).  Before a warrant can issue the magistrate must be provided with facts that show there is "probable cause to search for and seize a person or property under Rule 41(c)."  Federal Rule of Criminal Procedure 41(d)(1).  If the law enforcement officer requesting the seizure of property provides information outside of the four corners of the written affidavit the information must be by way of sworn testimony.  Federal Rule of Criminal Procedure 41(d)(2)(B).  Additionally, the testimony provided to the magistrate must be recorded.  Federal Rule of Criminal Procedure 41(d)(2)(C).

The Government may maintain that the defects present in the warrants in question, such as the failure to include a receipt of inventory seized document, are ministerial and, therefore, that the defendant must show that he has been prejudiced.  United States v. Hall, 505 F.2d 961 (3rd Cir. 1974).  Under normal circumstances the defense would have to agree with the Government.  In this case, however, the facts seem to lead inescapably to the conclusion that the state trooper, and the sitting magistrates, intentionally disregarded the language in the documents and, instead, by omission, simply presumed the documents to be adequate under the Fourth Amendment to the United States Constitution.  See U.S. v. Amendola, 558 F.2d 1043 (2nd Cir.

1977).  The defense would maintain that the search warrant applications and affidavits were so lacking in probable cause, both technically and substantially, that it is unreasonable to believe that the sitting magistrates believed that probable cause existed.  U.S. v. Leon, 468 U.S. 879, 923 (1984).

It strains credulity that an experienced veteran of the Pennsylvania State Police force and two appointed state magistrates, on four different dates, failed to recognize the absence of an important element of a criminal offense, on ten search warrants, while also missing the absence of inventory forms, the wrong dates and the failure to have witnesses support the documents.

All the evidence obtained by use of the search warrants should be excluded from evidence in the defendant's case.   Weeks v. United States, 232 U.S. 383 (1914).   The Government should not be allowed to rely on the good faith exception to the exclusionary rule under United States v. Leon because it is clear even if the officer abandoned his role of preparing valid search warrants and the magistrates abandoned their roles of neutrality and detachment; otherwise, one or more of the consistent and continued reserves would have been discovered.

**[A]**     **Standing.**

The Government maintains the defendant lacks standing to litigate the seizure of Verizon telephone records.  The defense argues, however, that the defendant had a legitimate expectation of privacy in the telephone records that were under his name and attributed to his accounts.  See Minnesota v. Olsen, 495 U.S. 91 (1990).  Furthermore, the defendant's actions, prior to his arrest, showed no intent to abandon his ownership of these records.   See United States v. Salducci, 440 U.S. 83 (1980).

Respectfully submitted,

s/ Gerald A. Lord

Gerald A. Lord, Esquire
Miller, Poole & Lord, LLP
139 East Philadelphia Street
York, PA 17403
(717) 845-1524
Sup. Ct. I.D. No. 49539